# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JASON LADWIG,                          :

     Plaintiff,                 :
                                       Case No. 3:15cv00128

  vs.                                :

                                         District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                     :      Chief Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,               :

     Defendant.                 :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff Jason Ladwig brings this case challenging the Social Security Administration's denial of his application for Disability Insurance Benefits.  He asserts here, as he did before the Administration, that beginning on December 23, 2011, he has been under one or more benefits-qualifying disability.  He asserted that his disabilities involved chronic pain in his lumbar spine; chronic migraines, asthma, and bronchitis; and sleep apnea, a learning disability, concentration problems, and bladder issues.  (Doc. #7, *PageID*# 315).

The case is presently before the Court upon Ladwig's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), the administrative record (Doc. #6),

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

and the record as a whole.

## II.  **Background**

### A.  **Ladwig's Vocational Profile and Testimony**

Ladwig was 46 years old on his alleged disability onset date, placing him in the category of a "younger" person for purposes of resolving his application for Disability Insurance Benefits.  *See* 20 C.F.R. §404.1563(c).  He attended special education classes during high school and later completed a GED.  (Doc. #6, *PageID#* 316).  His  past employment has involved work as a loss prevention manager in retail business.

During his administrative hearing before Administrative Law Judge Elizabeth A. Motta, Ladwig testified that he lives with his wife and drives maybe an average of two hours in a week.  *Id*. at 136.  Before his spinal fusion surgery, he was driving "maybe a half hour to an hour" due to his pain levels.  *Id*. at 137.  He testified that he had also undergone back surgery in January 1996 after which his back pain progressively worsened to the point he "couldn't physically do it."  *Id*. at 140.

Treatment for Ladwig's back problems has consisted of injections and pain medications.  He also had a spinal cord stimulator, which worked initially, but "then it just stopped working." *Id.*  The only alternative was the fusion surgery (which he had in October 2013, *see id*. at 774-80).  After his fusion surgery, he needed to use a walker for about three weeks.  He then started to use a cane because he couldn't support his body weight at times.  He continued to use a cane thereafter and  was using at the hearing.  *Id*. at 141-42.

2

Ladwig unsuccessfully attempted to work as a driver, helping intellectually challenged people go to doctor appointments.  He explained that he could not perform a "lighter" job, like working as a cashier, because his high pain levels would cause him to be absent or leave work early and be terminated.  *Id*. at 142.  After Ladwig stopped working in December 2011, he pursued unemployment benefits even though he did not think he could hold a job.  He pursued unemployment benefits because he "was willing to do anything to put food on the table.  I had to do what I had to do.  We needed the money."  *Id*. at 149.

Ladwig testified that the only thing that really gives him relief is to lie down or to recline in his chair with pillows underneath his legs.  *Id*. at 153.  He described getting up from lying down or sitting as "excruciating."  *Id*.  He estimated that from the time he gets up in the morning until he goes to bed at night, he is either lying down or reclining in a chair with his feet propped up about 80 percent of the day.  *Id*. at 157.  And he estimated that he has "bad days" about 20 days in a typical month.  *Id*. at 158.

Ladwig described standing and sitting as "very uncomfortable," and he is unable to stand very long or sit very long without needing to shift.  *Id*. at 153-54.  He estimated he can stand for about 10 to 15 minutes at a time.  *Id*. at 158.  He has difficulty carrying things.  It hurts him to carry a gallon of milk.  *Id*. at 158-59.

## B.  **Medical Evidence**

Ladwig underwent back surgery, a discectomy, in 1996.  (Doc. #6, *PageID*# 393).  His earnings record shows that he continued to work until nearly the end of 2011, consistent with

his asserted disability onset date of December 23, 2011 and his testimony. *Id*. at 188. Dr. Nguyen began treating Ladwig's back pain in April 2011 and continued to treat him on a monthly basis through 2011 and into 2012. *Id.* at 453-82.

In January 2012, Ladwig took his back problem to orthopedic surgeon, Dr. Lehner. Dr. Lehner noted he had seen Ladwig in 2009 with a coccygeal issue, which had resolved. Ladwig reported low-back pain located above his 2009 coccygeal pain. Pain required him to change position if he sits, stands, or walks around for more than 15 minutes at a time. He rated his pain severity at the level of 8 on a 1-10 scale. He was emotionally labile in office, broke down crying a few times. *Id*. at 402. Dr. Lehner noted that an MRI of Ladwig's back revealed "significant degenerative disease ...." *Id*. Dr. Lehner observed, "You can say that L5-S1 looks bad." *Id*.

On February 8, 2012, Dr. Lehner performed a discogram at L3-4, L4-5, and L5-Sl. Dr. Lehner thought that if he did any surgery, it would involve surgical fusion from L4 to the sacrum. *Id*. at 399. Ladwig did not choose surgery at this time. He instead continued to see Dr. Nguyen for treatment, including injections. *Id.* at 453-82.

In December 2012, Dr. Lehner noted that lumbar spine x-rays showed mildly decreased disc height at the L5-S1 vertebral levels and possible minimally decreased height at the L4-5 levels. *Id*. at 650. Dr. Lehner explained and opined, "He has a disability claim. Social Security has denied him at this point. I don't think you can get much more positive than going through a diskogram and having the diskogram show that there are problems. He has done all

4

that, so I certainly think he is somebody who certainly fits the bill of somebody who has troubles and should be considered a possible candidate for disability." *Id*.

Progress notes from December 2012 to September 2013 contain a "Disability Placard Card," written by Dr. Ranginwala, indicating that Ladwig "cannot walk 200 feet without stopping to rest." *Id*. at 771. In April 2013, Dr. Lehner examined Ladwig and found him to be "extremely stiff." *Id*. at 649. Dr. Lehner reported:

> Jason came back today for us to take a look as his back and he is having more troubles. He has trouble even standing up for more than ten minutes at a time. His pain management doctors have told him that they think that he might be a candidate for a spinal cord implant. My opinion is that, when you have a standard organic problem, which is what a degenerative disk is, people do better with a fusion. He knows that I consider a fusion for this as the worst type of case that I would do a fusion on just because the people who have this, regardless of how it is treated, can have pain afterwards. If he decides to go with the electrical stimulator, I just wanted him to know that my feeling is that the standard of care is to do a fusion for this area.

*Id*. at 649.

Dr. Lehner opined in July 2013, that Ladwig could not lift any significant amount of weight, could stand/walk for no more than ten minutes at a time and one hour during an eight-hour workday, and could sit for no more than thirty minutes at a time for two hours in an eight-hour workday. He further opined that Ladwig could never perform any postural activities and was limited in his ability to reach, handle, push, and pull. Dr. Lehner also found that Ladwig cannot focus and concentrate as a result of his pain. Dr. Lehner concluded that Ladwig would miss more than three days of work per month due to his impairments and would be unable to perform even sedentary work. *Id*. at 718-26.

5

In August 2013, Dr. Lehner explained that after he had last seen Ladwig, he had an electrical stimulator put in.  But, Ladwig said it was "totally nonfunctional" and he wanted it removed.  *Id*. at 842.  Surgical anterior interbody fusion at L4-L5 and L5-S1 was the next step, which he occurred in October 2013.  *Id*. at 774-80.

Two months later, Dr. Lehner noted that Ladwig was "really not any better except that the pain in his leg has gotten better ... [t]he back is awful."  *Id.* at 838.  Dr. Lehner noted that Ladwig "actually tried to sneak into doing a little bit of work and worked as a bus driver for just a few hours a day....  and he is totally incapable of continuing to do that."  *Id*.  An x-ray showed intact surgical hardware with no problems with instrumentation or alignment.  Dr. Lehner opined, "[Ladwig] is probably going to remain disabled ... until at least six months after surgery and I'm not very optimistic about him being able to get back to doing any work at that point."  *Id*.

Dr. Lehner's opinions stand in contrast to the opinions by two physicians – Dr. Bertani and Dr. Lehv – who reviewed the record at the request of the state agency (Ohio Division of Disability Determination).  In July 2012, Dr. Bertani opined that Ladwig could perform light work with occasional climbing of ramps, stairs, ladders, ropes, or scaffolds, and occasional stooping.  *Id*. at 178-79.  In November 2012, Dr. Lehv agreed with Dr. Bertani's assessment.  *Id*. at 194-95.  "Light work" involves – among other abilities – "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...."  20 C.F.R. §404.1567(b).

6

A detailed description of the remaining medical records and opinions is unnecessary because the undersigned has reviewed the entire administrative record and because both parties and the Administrative Law Judge (ALJ) have discussed the pertinent records in detail.

## III.   "Disability" Defined and the ALJ's Decision

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – *i.e.,* "substantial gainful activity," in Social Security terminology.[2] 42 U.S.C. §423(d)(1)(A); *see Bowen*, 476 U.S. at 469-70.

The ALJ found that Ladwig was not under a benefits-qualifying disability by applying the Social Security Administration's five-step sequential evaluation procedure.  *See* 20 C.F.R. § 404.1520(a)(4).  The ALJ's more significant findings began at step two, where the ALJ concluded that Ladwig had several severe impairments, namely, "lumbar degenerative disc disease, pulmonary disorders (mild chronic obstructive pulmonary disease and mild obstructive sleep apnea), and obesity."  (Doc. #6, *PageID#* 111).

At step three, the ALJ concluded that Ladwig's impairments or combination of impairments did not meet or equal the criteria in the Commissioner Listing of Impairments,

---

[2] In addition, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423.

including the Listings. *Id*. at 114.

At step four, the ALJ concluded that Ladwig's residual functional capacity or the most he could do in a work setting despite his impairments, *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consisted of the following.:

> [He can] perform less than the full range of light work ...: lift up to 20 pounds occasionally and 10 pounds frequently; standing and walking limited to combined total of four hours in an eight-hour workday; option to alternate positions as frequently as 15-minute intervals; only occasional postural activities, such as climbing stairs/ramps, balancing, stooping, kneeling, crouching or crawling; no climbing ropes, ladders or scaffolds; no exposure to hazards, such as moving or dangerous machinery or working at unprotected heights; no exposure to vibration; no concentrated exposure to dust, odors, gases, fumes or poorly ventilated areas; no exposure to extremes of cold, heat, wetness or humidity; and no strict production quotas or fast pace.

*Id*. at 115 (internal citation omitted). The ALJ also concluded at step four that Ladwig could not perform his past relevant work. *Id*. at 122.

At step five, the ALJ found Ladwig could perform a significant number of jobs that exist in the national economy. And, the ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Ladwig was not under a benefits-qualifying disability. *Id*. at 109-24.

## IV.   **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

9

V.     **Discussion**

Ladwig contends that the ALJ erred by substituting her own lay medical opinions in place of the opinions provided by his treating surgeon Dr. Lerner.  Ladwig reasons, "Essentially, ALJ Motta determined that her interpretation of the evidence differs from Dr. Lehner's interpretation, and, thus, his opinion is not entitled to controlling or even deferential weight."  (Doc. #7, *PageID*# 910) (citing Doc. #6, *PageID*# 121).  Ladwig further points out that there are no examining source opinions contradicting Dr. Lerner's opinions and that Dr. Ranginwala issued a disability parking-placard form indicating that Ladwig was unable to walk more than 200 feet without stopping to rest.

The Commissioner contends that the ALJ reasonably discounted Dr. Lerner's opinions because (a) it was unsupported by the evidence in the record, (2) Dr. Nguyen's records document that Ladwig was doing well and able to attend to most of his activities of daily living, and (3) progress notes from primary care physician Dr. Thomas show no significant musculoskeletal abnormalities and document full muscle strength and other normal findings. The Commissioner further argues that the ALJ reasonably evaluated Dr. Ranginwala's opinion (about Ladwig's limited walking ability) and reasonably evaluated the opinions provided by the state agency reviewers, Drs. Bertani and Lehv.

Social Security Regulations recognize several different categories of medical sources: treating physicians, nontreating yet examining physicians, and nontreating record-reviewing physicians. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

10

As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing, in part, 20 C.F.R. §404.1527(c)(1), (d) (eff. April 1, 2012)).

A treating source's opinion is given controlling weight under the treating-physician rule when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Gayheart*, 710 F.3d at 376; *see* 20 C.F.R. §404.1527(c)(2) (eff. April 1, 2012); Social Security Ruling 96-2P, 1996 WL 374188 at *1 (July 2, 1996). "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376 (citation omitted).

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of

medical opinion." *Id*. (citing 20 C.F.R. §404.1527(c)(6) (eff. April 1, 2012)).

The ALJ placed little weight on the opinions provided by Dr. Lerner because his opinions were "unsupported by objective signs and findings in the preponderance of the record," and Dr. Lerner did not explain his February 2013 conclusion that Ladwig was unable to perform even sedentary work.  (Doc. #6, *PageID*# 121).  These reasons ignore or overlook the significance of the objective testing Dr. Lehner relied on and the information he provided in support of his February 2013 opinions.  *Id*. at 718.  Dr. Lehner explained that Ladwig's MRI "shows degenerative changes at L4-5 and L5-S1.  I have done a Discogram at these level and at L3-4.  Discogram was positive at L4-5 and L5-S1 for reproduction of his back pain.  It was negative at L3-4."  *Id*.  Ladwig's MRI results constitute objective medical evidence, *see* Listing 1.00(C)(1), as do the results from his Discogram, which is a procedure involving x-rays.  *See* Listing 1.00(C)(1), 20 C.F.R. Part 404, Subpart P, Appendix 1.  "A discogram is a diagnostic procedure to determine if [a patient's] vertebral disc(s) is/are [the] source of back pain....  [T]he procedure is performed under fluoroscopy of x-ray.  During the procedure, a needle is inserted into the vertebral discs.  If the disc is the source of [the patient's] back, spine, extremity and/or leg pain the injection will temporarily reproduce [the patient's] symptoms, thus resulting a positive discogram.  If the disc is not the source of ... pain the injection will not reproduce the patient's symptoms or cause any discomfort, thus resulting a negative discogram."[3]  Because Dr. Lerner relied on Ladwig's MRI results and the results of Ladwig's Discogram – positive at

_____

[3] http://www.hopkinsmedicine.org/pain/blaustein_pain_center/pain_procedures/discogram.html

L4-5 and L5-S1 for reproduction of his back pain – substantial evidence does not support the ALJ's finding that objective evidence failed to support Dr. Lerner's opinion and Dr. Lerner failed to explain his opinion that Ladwig could not perform sedentary work. Additionally, Dr. Lerner's opinions are consistent with his treatment notes. For example, he discussed the Discogram results with Ladwig on December 12, 2012, and he explained in his assessment/ plan, "I think that if I do anything here it is going to have to be a fusion from L4 to the sacrum....." (Doc. #6, *PageID*#399). Eight days later, Dr. Lerner discussed the possibility of fusion surgery with Ladwig, noting, "He knows that, if I recommend doing anything, it would be a fusion from L4 to the sacrum...." *Id*. at 398. Dr. Lerner's next statements reveals that he had no doubt surgery was warranted, if Ladwig chose it. Dr. Lerner wrote:

> We would probably do anterior grafts at L4-5 and L5-S1 and posterior instrumentation and maybe even percutaneous instrumentation posteriorly to stabilize this area together. I think that I would want to get a good anterior fusion in place if I do this.
>
> I talked with him about all of this today. He is not sure if he wants to do anything surgically with this. As part of that, he is just scared of having anything done to him surgically and I can understand that. Certainly we will bow to his desires here. Nobody can guarantee him that doing a fusion for disk disease is going to be absolutely be successful. We just have to go by track record of people who have these problems and who have had these types of issues in the past and how they have done. I told him that, in general, people do do [sic] fairly well with this, so it is something we can offer him.

*Id*.

The ALJ essentially substituted her lay medical opinion concerning the objective evidence in place of Dr. Lerner's. This constituted error especially because Dr. Lerner was

13

Plaintiff's treating orthopedic specialist and because he relied on objective medical evidence and provided some explanation in support of his opinions. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (citing *Meece v. Barnhart*, 192 F. App'x. 456, 465 (6th Cir. 2006); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")).

Next, the ALJ viewed Dr. Lehner's progress notes, and progress notes from Ladwig's primary care physician, as documenting few significant objective abnormalities, and instead documenting his subject complaints. The ALJ also observed that Dr. Lerner noted intact surgical hardware on Lerner's December 2013 x-rays showed, which likewise showed no problems with instrumentation or alignment, despite Ladwig's complaint of significant pain. The ALJ explained that the limitations identified in her assessment of Plaintiff's residual functional capacity "adequately account for these findings." *Id*. To counter these reasons, Plaintiff points to information Dr. Lerner provided in letter he wrote in May 2014, about two months after the ALJ's decision. Dr. Lerner criticized the ALJ's findings, explaining:

> ... When an MRI shows a degenerative disc as a specific level, discography has been used to differentiate disc between these symptomatic levels and non-symptomatic levels. In Mr. Ladwig's situation L4-5 was significantly positive with giving severe back pain. We did a Discogram at L3-4 at that time that was completely negative. This would give us some indication that L4-5 was the source of troubles....

*Id*. at 897. Dr. Lerner observed that although the ALJ "talks about an MRI report ... and about the absence of nerve root impingement, "[n]o one is challenging whether there is nerve root impingement or not. This has nothing to do with degenerative disc disease." *Id*. Dr. Lerner

14

also observed that when he saw Ladwig on December 30, 2013, he "complained that his 'back felt awful' and the fact that x-rays looked normal, did not mean to me that everything was alright. With the Discogram being positive at L4-5 and L5-S1, I obviously was willing to commit to doing a fusion at those two levels ...." *Id*. Dr. Lerner confirmed his view that Ladwig "has had severe back pain and that he has not responded to surgical fusion of the lowest two lumbar levels...." *Id*. at 898. And, Dr. Lehner reported that discogenic disc disease can be incapacitating in patients, like Ladwig. *Id*. at 897-98.

The problem Dr. Lerner's letter creates – a problem not mentioned by the parties – is that it post-dates the ALJ's decision and was therefore unknown to her at the time of her decision. Ladwig's counsel submitted Dr. Lerner's letter and additional evidence to the Appeals Council (which denied review). (Doc. #6, *PageID*#s 61-65).

"[E]vidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Yet, the Court may remand the matter to the Social Security Administration for further proceedings in light of such evidence. *Id.* This occurs when the evidence is new and material, and good cause exists for "not presenting it in the prior proceeding." *Id*. Dr. Lerner's December 2013 letter constitutes new evidence because he did not write it until after the ALJ issued her decision. *See id*. ("Evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'") (quoting, in part, *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Dr. Lerner's letter is

15

material because there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Id*. Dr. Lerner's explanation and further information raise cogent substantive information that directly refutes the ALJ's reasons for rejecting his opinions.  Much of the information Dr. Lerner discusses concerns purely medical issues about degenerative disc disease and testing, in general, and Ladwig's severe back pain, in particular. *See* Doc. #6, *PageId*# 897-98.  For these reasons, Dr. Lerner's May 2014 letter constitutes material evidence by creating the reasonable probability that, if it had been available to the ALJ and the Commissioner, the outcome of Ladwig's administrative proceedings would have been different.   Lastly, good cause exists to explain why Ladwig did not submit the evidence to the ALJ before her decision.  This is seen in the fact that Dr. Lerner's letter responded to the ALJ's decision and countered the ALJ's reasoning.  Because Dr. Lerner could not have responded in this manner to the ALJ's decision until after she issued it, good cause existed to explain why Ladwig did not present Dr. Lerner's letter during the administrative proceedings.

Turning to credibility, an ALJ's credibility findings are generally due "great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id*.

The ALJ discounted Ladwig's "statements concerning the intensity, persistence and

16

limiting effects of these symptoms are not credible to the extent they are inconsistent with the

above residual functional capacity assessment, for the reasons explained in this decision."

(Doc. #6, *PageID#* 116). This boilerplate language has been frequently criticized on the

ground that it suggests the ALJ reversed the credibility analysis by first establishing the

claimant's residual functional capacity, and then addressing the claimant's credibility. *See Cox*

*v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 260 (6th Cir. 2015) (and cases cited therein). The

Seventh Circuit has been pointed in its criticisms:

> One problem with the boilerplate is that the assessment of the claimant's
> "residual functional capacity" (the bureaucratic term for ability to work) comes
> later in the administrative law judge's opinion, not "above" — above is just the
> foreshadowed conclusion of that later assessment. A deeper problem is that the
> assessment of a claimant's ability to work will often ... depend heavily on the
> credibility of her statements concerning the "intensity, persistence and limiting
> effects" of her symptoms, but the passage implies that ability to work is
> determined first and is then used to determine the claimant's credibility. That
> gets things backwards.

*Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). The "deeper" problem is especially

noteworthy because by getting "things backwards," it suggests the ALJ harbored a

preconceived non-evidence-based hunch about the claimant's lack of credibility rather than

applying the correct legal criteria to the evidence of record.

Regardless of whether or not ALJ Motta actually had such a hunch, the Sixth Circuit's

"chief concern" with the boilerplate credibility language "is the risk that an ALJ will

mistakenly believe it sufficient to explain a credibility finding, as opposed to merely

introducing or summarizing one." *Cox*, 615 F. App'x at 260. This chief concern leads the

17

analysis to ALJ Motta's reasons, and whether substantial evidence supports those reasons, for finding Ladwig less than credible.

Substantial evidence fails to support several of the ALJ's reasons for discounting Ladwig's credibility.  The ALJ reasoned first that the objective medical evidence, including the objective signs and findings from Dr. Lerner, do not support Ladwig's claim of disabling pain. (Doc. #6, *PageID*#117).  This, however, commits the same error addressed above: The ALJ improperly substituted her own lay medical opinion in place of Dr. Lerner's medical opinion about the significant problems shown by Ladwig's MRI and Discogram.

The ALJ also discounted Ladwig's credibility based on the fact that he did not undergo spinal fusion surgery until October of 2013, have spent approximately 12 months considering surgery as a treatment option.  (Doc. #6, *PageID*# 117).  The ALJ thus suggests that such a lengthy pre-surgery waiting period reveals that Ladwig's pain level could not have been severe. But, Ladwig's treatment records detail the multiple methods of "conservative" pain management and treatment that he underwent over this 12-month period before he was left with no other option but to undergo surgery.  Given the inherent risks associated with any surgery, the fact that Ladwig avoid or delayed surgery for 12 months fails to create a reasonable inference that his pain levels were not severe.

The ALJ also discounted Ladwig's credibility based on his attempt to return to work as a bus driver.  Doing so, the ALJ quoted parenthetically Dr. Lerner's note indicting that Ladwig "'tried to sneak into doing' work" against his orders.  (Doc. #6, *PageID*# 118).  The fact that

18

Ladwig attempted unsuccessfully to work tends to confirm the existence of his severe pain levels and the sincerity of his testimony that he wanted to return to work but could not because of his back pain.  Additionally, in light of the fact that, in the end, Ladwig's spinal impairment and resulting back pain required another surgery, his credibility is bolstered.

Accordingly, Ladwig's Statement of Errors is well taken.

## VI.   **Remand is Warranted**

Ladwig seeks an Order reversing the ALJ's decision and remanding for benefits or, at a minimum, a remand for further proceedings.

Remand is warranted when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F.3d at 746.  Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."

19

*Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence four of §405(g) due to problems set forth above. On remand the ALJ should be directed to review Plaintiff's disability claim to determine anew whether he was under a benefits-qualifying disability under the applicable five-step sequential evaluation procedure, including, at a minimum, a re-assessment of Plaintiff's residual functional capacity and a re-consideration of the evidence at steps four and five of the sequential evaluation.

In addition, this matter is subject to remand under sentence four of 42 U.S.C. §405(g) for further proceedings in light of the new, material evidence presented in Dr. Lerner's May 2014 letter.

20

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Jason P. Ladwig was under a "disability" within the meaning of the Social Security Act;

3.      This case be remanded to the Commissioner and the Administrative Law Judge under sentence four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.      The case be terminated on the docket of this Court.


June 22, 2016

                    s/Sharon L. Ovington
                    Sharon L. Ovington
                Chief United States Magistrate Judge


21

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).